**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AAA Alarm & Security Incorporated,<br><br>    Plaintiff,<br><br>v.<br><br>A3 Smart Home LP,<br><br>    Defendant. | No. CV-21-00321-PHX-GMS<br><br>**ORDER** |

Before the Court is Plaintiff AAA Alarm & Security Incorporated's ("Plaintiff") Application for Preliminary Injunction. (Doc. 18.) Also pending is Defendant A3 Smart Home LP's Motion to Strike the Declaration of John Konchak. (Doc. 29.) The Court held an evidentiary hearing on the Motion for Preliminary Injunction on August 17 and August 18, 2021. For the following reasons, Plaintiff's Motion is granted, and Defendant's Motion is denied.

## BACKGROUND

Plaintiff AAA Alarm & Security, Inc. and Defendant A3 Smart Home LP provide home and business security services in Arizona. Plaintiff first used the AAA mark in 1985 when it began operating under the name "AAA Alarm & Security." (Doc. 18-1 at 1.) Since then, Plaintiff's business has served over 8,000 customers across Arizona. *Id.* at 3. Its business includes use of the AAA mark on several promotional mediums, including branded stickers, yard signs, magnets, vehicles, and employee T-shirts. Plaintiff also

advertises on its website and via print ads and promotional brochures. *Id.* at 2. These advertising expenditures amount to nearly $200,000 since 2014. (Doc. 28-1 at 1.)

In Fall 2019, Plaintiff began receiving communications from people who believed they were AAA Alarm & Security customers, but who were actually customers of Defendant. *See* (Doc. 18-1 at 3–4.) A chart maintained by Plaintiff's employees documenting erroneous calls from Defendant's customers contains over 200 entries. (Doc. 18-4 at 6–19.) Plaintiff also received several mailed documents and emails directed to Defendant. These included three unemployment insurance notices from the Arizona Department of Economic Security, a request from a fiduciary to modify the terms of her ward's service, checks and cancellation notices addressed to Defendant from its customers, and alarm permits from the City of Phoenix. (Doc. 18-1 at 4–6.) Plaintiff also received false alarm notices from governmental entities. Plaintiff did not experience this confusion before Defendant entered the Arizona market as AAA Smart Home. *Id.* at 6.

The American Automobile Association of Northern California, Nevada, and Utah acquired an Arizona security business, SAFE Security, in November 2018. (Doc. 27-1 at 3.) After the acquisition, the name of the business was changed to A3 Smart Home LP and it began operating under the brands "AAA Smart Home" and "AAA Smart Business." *Id.* A3 Smart Home has approximately 20,000 customers in Arizona. *Id.* A3 Smart Home's Manager of the Member Experience Monitoring Center, Jessica Winter, avows that she is aware of no instance where an individual contacting Defendant was experiencing any sort of confusion between it and Plaintiff's business. (Doc. 27-2 at 3.) Although the hearing testimony highlighted that she may not have been in a position to be aware of such confusion.

**DISCUSSION**

**I.     Standard of Review**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d at 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997)). A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without an injunction; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**II.     Analysis**

    **A. Likelihood of success on the merits**

AAA Alarm pleads claims for Lanham Act unfair competition, state statutory trademark infringement, common law trademark infringement and unfair competition. Plaintiff asserts that its common law trademark claim and state statutory trademark infringement claims warrant the preliminary injunction.

Common law trademark claims are substantially congruent to claims made under the Lanham Act. *See Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 956 (D. Ariz. 2020) (collecting cases); *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) ("[I]n the Ninth Circuit, claims of unfair competition and false advertising under state statutory and common law are 'substantially congruent' to claims made under the Lanham Act") (quoting *Cleary v. News Corp.*, 30 F.3d 1255 (9th Cir. 1994)). "The Arizona Court of Appeals has held that the common law doctrine of unfair competition 'encompasses several tort theories, such as trademark infringement, false advertising, palming off, and misappropriation.'" *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 983 (D. Ariz. 2015) (quoting *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124, 970 P.2d 954, 956 (Ct. App. 1998)). Courts thus address Arizona common law trademark claims under the framework of federal law. *See 3 Ratones Ciegos v. Mucha Lucha Libre Taco Shop 1 LLC*, No. CV-16-04538-PHX-DGC, 2017 WL 4284570, at *2 (D. Ariz. Sept. 27, 2017) (considering plaintiff's trademark infringement and unfair competition claims together).

To prevail on a trademark infringement claim, a plaintiff "must prove (1) that it has a protectible ownership interest in the mark; and (2) that defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon [plaintiff's] rights to the

mark." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). The touchstone for trademark infringement is likelihood of confusion, which asks whether a reasonably prudent consumer is "likely to be confused as to the origin of the good or service bearing one of the marks." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012). This determination is made by applying the well-established *Sleekcraft* factors: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) types of goods and degree of care exercised by consumers, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). This eight-factor test is "pliant"; "the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

"Utilizing the eight-factor test, plaintiffs may establish a likelihood of consumer confusion as a result of either (1) forward confusion, or (2) reverse confusion." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). Plaintiff appears to claim both forward and reverse trademark confusion. "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Surfvivor*, 406 F.3d at 630. Reverse confusion, on the other hand, "occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id.* As explained via the factors below, Plaintiff has established a prima facie case of both forward and reverse confusion. The Court finds, however, that Plaintiff is likely to succeed on its reverse confusion claim.

### a. Plaintiff's Ownership Interest in the "AAA" Mark

"To establish a protectible ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.'" *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) (quoting *Watec Co.,*

*Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005)).

### i. Senior Use

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996). Whether a party is a senior user is determined by both the timing and subject matter of the use. "When a senior user of a mark on product line A expands later into product line B and finds an intervening user, priority in product line B is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation at the time of the intervening user's appearance." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1051 (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 16.5 (4th ed.1998)). "The 'natural zone of expansion,' however, is generally defined narrowly." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 984 (C.D. Cal. 2002) (*citing Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1028–29 (11th Cir. 1989)). A user's natural zone of expansion is a function of the defendant's territory, market penetration, and the manner in which the products are advertised. *See id.*

Here, James Livingston, president and sole owner of AAA Alarm & Security, Inc., avows that he "began doing business as AAA Alarm & Security in 1985 in Arizona and [has] used AAA Alarm & Security as [his] company brand continuously and exclusively since then." (Doc. 18-1 at 1.) In contrast, Defendant claims that the AAA brand affiliated with the American Automobile Association has used the mark in commerce since 1902. Over time the mark's use has expanded to promote a wider variety of goods and services, including home insurance, financial services, travel services, and repair services. From these past campaigns, Defendant argues that the A3 security service is a natural expansion of other AAA services focusing on "security, safety, and the home." (Doc. 27 at 5.) Although products and services need not be precisely related to confer protection on a strong mark, *see* 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 24:20 (5th ed.), Defendant's expansive application of the doctrine is not justified. "The 'related goods' and 'natural expansion' tests are simply applications of the likelihood of

confusion analysis in particular factual situations." *iShow.com, Inc. v. Lennar Corp.*, No. C15-1550RSL, 2017 WL 1037550, at *2 (W.D. Wash. Mar. 17, 2017) (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1050–51). The test thus contemplates goods and services which are closely related, even if not identical. *See id.* "Where goods are closely related (such as pancake batter and pancake syrup) or where a senior user would normally and reasonably be expected to expand into another product line (from bicycle tires to auto tires, for example), the evidence may support a finding that, at the time the junior user began use, purchasers would have been likely to be confused as to source or as to sponsorship, affiliation or connection even if there were no actual prior use in the new market by the senior user." *Id.* (internal quotation omitted).

Defendant's assertion that it holds seniority over any service related to security, safety, and the home, stretches this confusion analysis to breaking point. Indeed, if the American Automobile Association were permitted to claim seniority in the AAA mark over any product or service in such broad categories of business, it could protect the AAA mark in potentially unlimited markets. Defendant entered the Arizona alarm and security market over 30 years after Plaintiff by purchasing a customer base in an industry it had not previously occupied. There is no evidence that Defendant expanded into this space prior to Plaintiff, and Defendant's customers were not previously affiliated with the AAA mark. Because Defendant has not demonstrated a clear relationship with the American Automobile Association's past uses of the AAA mark, the Court declines to determine it would likely be found the senior user of the mark and finds that the Plaintiff would likely be determined to be the senior user of the mark.

### ii. Continuous Use in Commerce

"To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1125–26 (9th Cir. 2006). "Use" of a mark in this context means "use in commerce." *See Glick v. Townsend*, 2015 WL

1282039 *3 (D. Mont. March 20, 2015). The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

"[T]he litigant attempting to establish priority of commercial use must demonstrate both adoption of the marks and '[u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Dep't of Parks*, 448 F.3d at 1126 (quoting *Brookfield Commc'ns, Inc.*, 174 F.3d at 1052). While "evidence of sales is highly persuasive, the question of use adequate to establish" first use is decided on the facts of each case. *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979). "While the first use need not be extensive, the use must be bona fide and commercial in character." *Dep't of Parks*, 448 F.3d at 1126. Courts in the Ninth Circuit look to the totality of the circumstances for purposes of determining whether a service "mark has been adequately used in commerce so as to gain the protection of the Lanham Act." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001). Under this approach, courts may consider non-sales activities, such as use in advertising or promotional material and the solicitation of potential customers. *Id.*

Plaintiff's use of the AAA mark includes print ads; branded T-shirts worn by technicians; and stickers, magnets, and yard signs in customer homes. (Doc. 18-1 at 2). Its website, as well as all of its invoices, are branded with the AAA mark. *Id.* at 2. Plaintiff has over 3,000 current customers and has served over 8,000 people across Arizona over the life of its business. *Id.* at 3. John Konchak, AAA Alarm & Security, Inc.'s accountant, avows that Plaintiff has spent nearly $200,000 on since 2014. (Doc. 28-1 at 1.)[1] This use is sufficiently public so as to identify the mark in an appropriate segment of the public mind. *See Chance*, 242 F.3d at 1158 (explaining that the plaintiff's totality of prior acts, taken together, can identify or distinguish the marked goods in an appropriate segment of

---

[1] Plaintiff also submitted a brief declaration with its Reply disclosing its spending on advertising. (Doc. 28-1 at 1.) As it is plainly responsive to Defendant's argument in its responsive briefing that "Plaintiff has presented no evidence of those efforts or the amount of money they have spent on them," (Doc. 27 at 10), Defendant's Motion to Strike the declaration is denied.

- 7 -

the public mind as those of the adopter of the mark).

### b. Likelihood of Confusion: The *Sleekcraft* Factors
### i. Strength of the Mark

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032–33 (9th Cir. 2010). There are several categories of trademarks: arbitrary (common words with no connection to the product), fanciful (coined phrases with no known connection to the product), suggestive (does not describe the features of a product but suggests them), descriptive (defines a particular characteristic of a product in a way that does not require any exercise of the imagination), and generic (describes the product in its entirety). *Surfvivor*, 406 F.3d at 631–32. Arbitrary marks, or marks whose design does not have an intrinsic connection to the products sold under the mark, should "be afforded the widest ambit of protection from infringing uses." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 506 (9th Cir. 1991) (quoting *Sleekcraft*, 599 F.2d at 349).

"After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength." *JL Beverage Co.*, 828 F.3d at 1107. Commercial strength looks at the strength of the mark in the marketplace. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009). Thus, because "[c]ommercial strength is based on 'actual marketplace recognition,' . . . 'advertising expenditures can transform a suggestive mark into a strong mark.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (quoting *Brookfield*, 174 F.3d at 1058). "[I]n claims of reverse confusion, the question is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *JL Beverage Co.*, 828 F.3d at 1107 (internal citation omitted). As such, the strength of both the senior and the junior mark is relevant to a court's analysis.

Here, the AAA mark is likely arbitrary because there is no fundamental connection

between the letters and security services, and the letters offer no description of the products they are associated with. Rather, the connection derives from the history of both companies' use of the mark. The commercial strength of the mark is less established. Plaintiff did not present significant evidence of actual marketplace recognition. However, it did demonstrate that it spent a significant portion of its revenue on advertising. John Konchak, AAA Alarm & Security, Inc.'s accountant, avows that Plaintiff has spent nearly $200,000 on advertising since 2014. (Doc. 28-1 at 1.) Mr. Konchak further testified that Plaintiff spends over $5,000 dollars a year on search engine optimization. These advertising expenditures and the arbitrary nature of the mark support a finding that the mark is strong enough to be protectable.

The relative obscurity of Plaintiff as a small business does not undermine this conclusion. In reverse confusion cases, "the senior user's mark is usually weaker than the junior user's. . . . [T]he lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *Glow Indus., Inc.*, 252 F. Supp. 2d at 988 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000)). Thus, evidence that Defendant's use of the AAA mark is nationally recognized as connected with the American Automobile Association supports Plaintiff's claim of reverse confusion. *JL Beverage Co.*, 828 F.3d at 1109 ("The national recognition of the [junior mark] increases the likelihood that consumers will believe they are doing business with [the junior user], not [the senior user].").

### ii. Relatedness of the Goods

"The standard for deciding whether the parties' goods or services are related is whether customers are likely to associate the two product lines." *Surfvivor*, 406 F.3d at 633. Here, both Plaintiff and Defendant offer home and business security services. As they offer essentially the same service, customers are likely to associate the two product lines. This factor favors the Plaintiff.

### iii. Similarity of the Marks

When considering the similarity of marks, courts consider the marks within the context of other identifying features and ask whether the marks are similar in sight, sound, and meaning. *Id.*

Here, the two marks are similar in sight and sound, given that each mark contains "AAA." Plaintiff operates under the name "AAA Alarm & Security, Inc." and Defendant operates as "A3 Smart Home, LP." The AAA mark is prominent in both names, and the differentiating terms in each, Smart Home and Alarm & Security, are more descriptive than the AAA designation. Both parties also promote their services using the "AAA" mark. (Doc. 18-1 at 2.) Plaintiff's advertising incorporates its name, and its logo includes a "AAA." *See id.* at 19. Defendant's web advertisements and logo likewise utilize the "AAA" mark. (Doc. 27 at 11.) In fact, as was demonstrated at the hearing, the first result for a search for "AAA Alarm & Security," Plaintiff's name, is an advertisement for Defendant's services. (Doc. 18-3 at 268.) These facts demonstrate the similarity of the marks. Moreover, because "[a] newcomer to a product field has . . . a legal duty to select a mark that is totally dissimilar to trademarks already being used in the field," any doubts as to similarity should be resolved against the newcomer. *Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. (BNA) 201, 208 (S.D. Cal.1975). This factor favors Plaintiff.

### iv. Evidence of Actual Confusion

Evidence that use of a mark or name has already caused actual confusion as to the source of a product or service is "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352; *Playboy Enters., Inc. v. Netscape Commc'ns*, 354 F.3d 1020, 1026 (9th Cir. 2004) ("[A]ctual confusion among significant numbers of consumers provides strong support for the likelihood of confusion.").

Plaintiff presents the following evidence of actual confusion: (1) Plaintiff has been contacted on several occasions regarding its recent acquisition (the acquisition, however, was of SAFE Security, the predecessor of Defendant); (2) on several occasions, official communications intended for Defendant, such as notices from the City of Phoenix or the

Arizona Department of Economic Security, were delivered to Plaintiff; (3) Plaintiff's representatives have received numerous customer phone calls, letters, and emails intended for Defendant. *See* (Doc. 18-1 at 1–7, 44–46, 57.); and (4) Plaintiff demonstrates at least one critical customer evaluation posted on the web concerning Plaintiff that was actually intended for Defendants. This evidence demonstrates that actual confusion in the future is likely.

Many courts specify that relevant confusion is that which affects consumers' purchasing decisions, not confusion generally. *See BDO Remit (USA), Inc. v. Stichting BDO*, No. CV1104054MMMCWX, 2012 WL 12895658, at *18 (C.D. Cal. Sept. 19, 2012) (collecting cases). Indeed, in *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes*, the Ninth Circuit agreed that a few misdirected letters were weak evidence of actual confusion. 616 F.2d 440, 445 (9th Cir. 1980). In *Americana Trading Inc. v. Russ Berrie & Co.*, however, the Ninth Circuit contrasted its conclusion in *Alpha Industries* with another case, *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791 (9th Cir. 1982). 966 F.2d 1284, 1289 (9th Cir. 1992). There, the Court reasoned that 28 misdirected letters were strong evidence of confusion to prove secondary meaning. *Id.* The Ninth Circuit's explicit comparison of these cases belies the conclusion that significant misdirected communications fail to establish confusion. *See id.* In fact, the Ninth Circuit has clearly recognized that confusion is not limited to evidence of diverted customers. Initial interest confusion—where a defendant uses a trademark in a manner calculated to capture initial consumer attention—may constitute trademark infringement even in the absence of a consummated sale transaction. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997) (infringement may occur where a confusingly similar mark "capture[s] initial consumer attention, even though no actual sale is finally completed").

For these reasons, the Court concludes that this factor favors a finding of a likelihood of confusion.

### v. Marketing Channels

In analyzing this factor, courts look to whether the parties distribute their goods in

the same marketing channels. *Surfvivor*, 406 F.3d at 633–34. Although the parties discuss Plaintiff's use of internet marketing, sticker and lawn signs, and branded vehicles and technician T-shirts, neither presented any evidence about how Defendant's advertising practices compared to these mediums. There was evidence, however, that both companies spent money on internet advertising and search engine optimization. Indeed, the evidence demonstrated that the result of these efforts was not only the use of the same advertising medium, but direct competition. As explained above, the first search result for Plaintiff's name was an advertisement for Defendant. However, as internet advertising is used across many industries, it is less determinative in the Court's overall analysis. *See Playboy Enters.*, 354 F.3d at 1028 ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."). Thus, this factor is likely neutral or slightly favors Plaintiff.

### vi. Degree of Consumer Care

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor*, 406 F.3d at 634 (citing *Brookfield Commc'ns., Inc.*, 174 F.3d at 1060). Where goods or services are expensive, confusion is less likely and consumers are presumed to exercise a greater degree of care and precision in their purchases. *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015) ("The goods in the present case are expensive. It is undisputed that the watches at issue sell for several hundred dollars."). Here, Plaintiff advertises its services for nearly $2,000 dollars. (Doc. 18-1 at 15.) This fact indicates that customers are likely to use a high degree of care when selecting their service. This factor thus appears likely to favor the Defendant.

### vii. Defendant's Intent & Likelihood of Expansion

The court assigns little weight at this time to the remaining *Sleekcraft* factors related to the defendant's intent in selecting the challenged mark and the likelihood of expansion into other markets. With respect to the Defendant's intent in selecting the mark, there is no

evidence suggesting that Defendant had any intent to confuse consumers when it decided to use the AAA mark. *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1059–60 ("[Defendant's] intent does not appear to bear upon the likelihood of confusion because it did not act with such an intent from which it is appropriate to infer consumer confusion."); *eAcceleration Corp. v. Trend Micro, Inc.*, 408 F. Supp. 2d 1110, 1117 (W.D. Wash. 2006) ("The intent factor, if present, will weigh heavily in favor of finding a likelihood of confusion but, if absent, will generally have no effect."). Likewise, the likelihood of expansion factor is granted minimal legal significance where a Plaintiff has already established that the parties offer overlapping goods. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017). As both parties deal in home and business security, their services overlap significantly. The factors are therefore not instructive.

### viii. Conclusion

On balance, the Court concludes that the majority of the *Sleekcraft* factors likely favor Plaintiff. Specifically, evidence of actual confusion weighs heavily in favor of likelihood of confusion at the preliminary injunction stage. *See Sleekcraft*, 599 F.2d at 352. The Court thus finds Plaintiff likely to succeed on the merits of its common law trademark violation claim.

### B. Irreparable Harm

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com. LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)). Mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). However, the Ninth Circuit has "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Irreparable injury is likely in the absence of an injunction where damage to a plaintiff's goodwill is likely. *See Am. Trucking Assoc., Inc. v. City of Los Angeles*, 559 F.3d

1046, 1057 (9th Cir. 2009) ("[L]oss of goodwill and reputation" supports injunctive relief); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.").

Here, Defendant's use of the AAA mark could continue to confuse consumers and diminish the distinctiveness of Plaintiff's brand, thereby preventing Plaintiff from controlling its reputation. Plaintiff presented evidence that personal referrals are a significant portion of its business. There was also testimony that customers often shortened its name to "AAA Alarm" when referring to it. Although Plaintiff did not quantify any apparent lost business from confusion with Defendant, it demonstrated such confusion was likely. Customer Dan McClennon testified that he erroneously contacted Defendant for service after being referred to Plaintiff. And Plaintiff demonstrated at the hearing that the first result for a search for "AAA Alarm & Security," Plaintiff's name, is an advertisement for Defendant's services. (Doc. 18-3 at 268.) The Court finds that these facts demonstrate confusion between Plaintiff and Defendant is likely. As such, Plaintiff has shown that it is likely to suffer irreparable harm in the absence of preliminary relief. *See My Taco Guy, LLC v. Taco Man Corp.*, No. CV171573FMOAJWX, 2017 WL 10434394, at *5 (C.D. Cal. Dec. 27, 2017) (finding that plaintiff demonstrated loss of control over business reputation and damage to goodwill where there were bad Yelp reviews from defendant's customers on plaintiff's page, and plaintiff received calls from defendant's customers believing they had booked a service with plaintiff).

### C. Balance of Equities

Where, as in this case, the plaintiff shows intentional infringement, the defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds). Indeed, "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration[.]'" *Id.* (citation omitted).

Because Plaintiff has shown that it is likely to succeed on its trademark infringement claims, the balance of hardships tips in its favor.

### D. Public Interest

An injunction that seeks to prevent confusion to consumers in a trademark case is in the public interest. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009). This is particularly true in this case because Plaintiff has presented evidence that confusion is already occurring, suggesting it will continue to occur absent an injunction.

### E. Security

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the plain language of the rule suggests that a bond is mandatory, the Ninth Circuit has held that it "invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted).

In the present case, Defendant did not request a bond until the evidentiary hearing. It seeks a bond of at least a million dollars, citing significant changes to its business which will flow from an injunction, without providing any real specifics concerning such asserted damages. However, the Court is cognizant that Defendant entered a market with an existing smaller business using their desired mark, and either declined to investigate or chose to ignore Plaintiff's presence. The amount of the bond Defendant seeks would completely prevent Plaintiff from seeking appropriate injunctive relief. In this case, the Court finds that a bond of $20,000.00 is sufficient, and Plaintiff must provide security in that amount.

### F. Conclusion

Plaintiff has met its burden for obtaining a preliminary injunction. It has shown that it is likely to succeed on the merits of its common law trademark infringement claim for reverse confusion, that it is will suffer immediate and irreparable harm if a preliminary injunction is not issued, that the balance of equities tips in its favor, and that an injunction

is in the public interest.[2] As Plaintiff focused solely on trademark infringement in support of its Motion for Preliminary Injunction, the Court need not address Plaintiff's remaining claims.

**IT IS THEREFORE ORDERED** that Plaintiff AAA Alarm & Security Incorporated's ("Plaintiff") Application for Preliminary Injunction (Doc. 18) is **GRANTED.**

**IT IS FURTHER ORDERED** that during the pendency of this litigation, Defendant A3 Smart Home LP; and its officers, agents, servants, employees, and attorneys; and any person acting in concert or participation with anyone previously described and having actual notice hereof; is enjoined from using the trademark AAA in the State of Arizona in connection with residential and commercial fire and burglar system installation, service, and monitoring services; home and business automation; data cabling; surveillance equipment installation and service; and access control.

**IT IS FURTHER ORDERED** that this Order is conditioned upon Plaintiff posting a bond in the amount of $20,000 pursuant to Fed. R. Civ. P. 65(c).

**IT IS FURTHER ORDERED** that Defendant A3 Smart Home LP's Motion to Strike the Declaration of John Konchak (Doc. 29) is **DENIED.**

Dated this 30th day of August, 2021.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge

---

[2] As Plaintiff has met the four *Winter* factors regardless, the Court need not address the parties' disagreement regarding whether Plaintiff is entitled to a presumption of irreparable harm under the Lanham Act in this context. 555 U.S. at 20.